UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANGELA S.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:20-cv-01135-MJD-SEB |
| | ) |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security,[2] | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON JUDICIAL REVIEW**

Claimant Angela S. requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her Social Security application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). See 42 U.S.C. § 423(d). For the reasons set forth below, the Court **REVERSES** and **REMANDS** the decision of the Commissioner.

**I. Background**

Claimant applied for DIB on May 5, 2016, alleging an onset of disability as of November 8, 1976, her date of birth. [Dkt. 19-2 at 16.] Claimant's application was denied initially and

---

[1] In an attempt to protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), after the removal of Andrew M. Saul from his office as Commissioner of the SSA on July 9, 2021, Kilolo Kijakazi automatically became the Defendant in this case when she was named as the Acting Commissioner of the SSA.

upon reconsideration, and a hearing was held before Administrative Law Judge Teresa A. Kroenecke ("ALJ") on September 5, 2018. *Id.* at 37. On January 17, 2019, ALJ Kroenecke issued her determination that Claimant was not disabled. *Id.* at 13. The Appeals Council then denied Claimant's request for review on February 13, 2020. *Id.* at 2. Claimant timely filed her Complaint on March 14, 2020, seeking judicial review of the ALJ's decision. [Dkt. 1.]

## II. Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, she is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits her ability to perform basic work activities, she is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 C.F.R. pt. 404, subpart P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform her past relevant work, she is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform her past relevant work, but can perform certain other available work, she is not disabled. 20 C.F.R. § 404.1520. Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).

In reviewing Claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019).

An ALJ need not address every piece of evidence but must provide a "logical bridge" between the evidence and his conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether Claimant is disabled. *Id.*

### III. ALJ Decision

The ALJ first determined that Claimant had not engaged in substantial gainful activity since January 1, 2014. [Dkt. 19-2 at 18.] At step two, the ALJ found that Claimant had the following severe impairments: "fibromyalgia, migraine headaches, a bipolar disorder, post-traumatic stress disorder, anxiety, and depression (20 CFR 404.1520(c))." *Id*. At step three, the ALJ found that Claimant's impairments did not meet or equal a listed impairment during the relevant time period. *Id.* at 19. The ALJ then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) except: She is limited to no more than occasional stooping, kneeling, crouching, crawling, and climbing of ramps and stairs. She is unable to climb ladders, ropes or scaffolds. She must avoid exposure to extreme heat, extreme cold, humidity, wetness, vibrations, or hazards, such as unprotected heights, or dangerous machinery. She is unable to tolerate more than occasional exposure to dusts, fumes, odors, or gases. She is able to sustain attention and/or concentration for at least two-hour periods at a

3

>   time and for eight hours in the workday for carrying out short, simple, routine tasks. She is able to use judgment in making work-related decisions consistent with this type of work (i.e. short, simple, and routine work). She is unable to perform tasks that require fast-paced production work or assembly line work. She is limited to work that involves only occasional interaction with supervisors and coworkers and no interaction with the public.

*Id.* at 23-24.

At step four, the ALJ found that Claimant was not able to perform her past relevant work during the relevant time period. *Id*. at 28. At step five, the ALJ, relying on testimony from a vocational expert ("VE"), determined that Claimant was able to perform jobs that exist in significant numbers in the national economy. *Id*. at 28. For example, the VE testified that Claimant would be able to work as a Laundry Worker, Mail Room Clerk, or Housekeeper. Accordingly, the ALJ concluded Claimant was not disabled. *Id.* at 30.

## IV. Discussion

Claimant has advanced a laundry list of arguments for reversing the ALJ's decision that can be sorted into two categories. First, Claimant argues that the ALJ did not give proper weight to her treating physician's opinion by failing to account for her doctor's finding that she would require unscheduled time off work. Second, Claimant contends that the ALJ did not provide an adequate basis for dismissing the State psychologists' check-box findings of moderate limitations in concentration.

### A. Treating Physician's Opinion

Claimant argues that the ALJ improperly discounted the opinion of her treating neurologist, Dr. Edward Zdobylak, when the ALJ failed to account for any time off task in making an RFC assessment. [Dkt. 22 at 12.] Specifically, Claimant argues that the ALJ committed reversible error in giving only limited weight to Dr. Zdobylak's medical opinion that,

4

two to three times per month, Claimant would need to take an unscheduled break during the workday due to migraine headaches. [Dkt. 19-7 at 68-70.] Each break would last approximately two to four hours. *Id.* at 69. In addition, Claimant would be absent from work approximately four times per month due to her migraines. *Id.*

Because Claimant filed her applications for benefits before March 2017, the applicable law provides that a treating source's opinion[3] is entitled to controlling weight if it is: "(1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *Burmester*, 920 F.3d at 512 (quoting *Id.*); *see also Reinaas v. Saul*, 953 F.3d 461, 465 (7th Cir. 2020). If an ALJ does not give a treating source's opinion controlling weight, the regulations require the ALJ to consider "the treatment relationship, frequency of examinations, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (citations omitted). As long as the ALJ considers these factors and minimally articulates her reasons, the Court will uphold her decision not to assign controlling weight to a treating physician's opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *see also Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014) (reasoning the ALJ must offer "good reasons" for discounting the opinion of a treating physician) (citations omitted).

---

[3] For claims filed after March 2017, an ALJ is not required to give special weight to the opinions of a disability applicant's treating physician. *See* 20 C.F.R. § 404.1520c. Instead, all medical opinions—from treating providers, Social Security's consultative examiners, and independent medical examiners—will be evaluated on an equal basis for "persuasiveness." The key factors a disability adjudicator will consider in evaluating the persuasiveness of an opinion are supportability and consistency. *See Id.* § 404.1520c(c)(1) and (c)(2).

*1. Dr. Zdobylak's Medical Opinion*

To better understand Claimant's argument, it is helpful to review Claimant's medical history. Claimant first sought treatment with Dr. Marc Cohen at Josephson Wallack Munshower Neurology on January 30, 2015. [Dkt. 19-9 at 96.] After several visits with Dr. Cohen and a break in insurance coverage, Claimant saw Dr. Zdobylak for symptom management and Botox on September 14, 2016, November 3, 2016, January 30, 2017, April 13, 2017, May 1, 2017, October 19, 2017, November 16, 2017, February 14, 2018, and May 9, 2018. [Dkt. 19-13 at 19, 140, 142, 145, 149, 151, 152, 156, 159 160.] On April 13, 2017, Dr. Zdobylak took a medical history of Claimant and stated

> **History Of Present Illness**
> The patient is a 40 year old Caucasian/White female with a complaint of headaches. The headaches began at 11 years of age and were initially experienced rare. Headaches, typical types are Migraine, are experienced 21 days per month and have been this frequent for the past 3 years. Differences in the current headaches include: longer duration than before, unable to concentrate, and current medications are not working. On a scale of 1 to 10 (10 being the most severe) the average pain level is 10. If left untreated the average headache lasts 3 days. If treated, the average headache lasts 4 hours. Based on the predominant headache type the patient experiences total loss of function (bed ridden). The pain is located in the temple, back of head, eyes, neck, and jaw. The pain is located on the both sides The character of the headache is throbbing, pulsating, and pressure. Associated features that occur before and during the headaches include soft touch hurts, changes in vision, blind spots, numbness or tingling of any body part, difficulty speaking, difficulty concentrating, nausea, vomiting, diarrhea, sensitivity to light, sensitivity to noise, sensitivity to smell, neck movements aggravate pain, neck muscles are tender to touch, exercise aggravates the pain, light-headedness, and weakness of any body part. Noted headache triggers include: stress, physical activity, dietary, and environmental. Non-medical treatments for relief consist of sleep, rest, quiet, darkness, cold compress, massage, and pressure over headache area. Prior failed headache medications include: Topamax, Inderal, Elavil among many others.

*Id.* at 45.

During the middle of Dr. Zdobylak's treatment of Claimant, on April 24, 2017, he completed a "Headache Assessment Form" describing Claimant's migraines, symptoms, triggers, and limitations. [Dkt. 19-7 at 64-70.] He noted that Claimant had experienced severe chronic migraine headaches "almost daily . . . 21 days out of a month," and that the migraines could last four to five days. *Id.* at 65-66. Her symptoms included vertigo, nausea/vomiting, photosensitivity, visual disturbance, mood changes, mental confusion/inability to concentrate,

6

sensitivity to light, noise, and smell, neck pain, difficulty speaking, and difficulty concentrating. *Id.* As a result, Dr. Zdobylak opined that during the times Claimant had a headache, she would be unable to perform even basic work activities. He further opined that she would be incapable of even a "low stress" job. *Id.* at 68-69. He also opined that Claimant would need to take unscheduled breaks during the workday two to three times per month, and that the breaks would need to be two to four hours long and occur in a place where Claimant could lie down or sit quietly in a dark place. *Id.* He also stated that Claimant would likely be absent from work about four times a month due to her migraines. *Id.* Dr. Zdobylak also indicated on the form that he did not find Claimant to be malingering. *Id.* at 67.

On October 19, 2017, Dr. Zdobylak noted in his chart an improvement in Claimant's symptoms since the start of regular Botox treatment:

**History Of Present Illness**
Number of Headache Days per month PRIOR to first Botox treatment: 30
Number of Headache Days per month AFTER the last Botox treatment: 8

Level of Headache Intensity PRIOR to the first Botox treatment: 10
Level of Headache Intensity AFTER the last Botox treatment: 5

Effectiveness of acute headache medications PRIOR to the first Botox treatment: Reduced headaches 10% of the time
Effectiveness of acute headache medications AFTER the last Botox treatment: Reduced headaches 90% of the time

Number of times per month the patient visited ER or Immediate Care Center PRIOR to your first Botox treatment: 2
Number of times per month the patient visited ER or Immediate Care Center AFTER the last Botox treatment: 0

Situations that Botox has helped (family, work, or school): Mood is marked improved, emotional improvement

[Dkt. 19-13 at 152.]

2. *The ALJ's Assessment*

In assigning weight to Claimant's treating physician, the ALJ gave only limited weight to Dr. Zdobylak's opinion "in light of claimant's activities." [Dkt. 19-2 at 27.] "Moreover," the ALJ stated, Claimant's "migraines have improved with treatment." *Id.* However, earlier in her

7

decision, when discussing whether Claimant's impairments equaled a listing in Appendix I, the ALJ offered more reasons for not fully crediting Dr. Zdobylak's opinion. The ALJ first opined that Dr. Zdobylak's opinions in his questionnaire were not consistent with Claimant's testimony. *Id.* at 21. The ALJ also found that Dr. Zdobylak had relied on Claimant's subjective statements, not objective clinical findings, because Dr. Zdobylak had only known Claimant since September of 2016. [Dkt. 19-2 at 21.] In support of her reasons, the ALJ noted that Claimant had testified that "she takes care of cats for an animal shelter on a regular basis. She home schools her son. She travels to Florida every three months to assist her elderly grandparents. These visits last three weeks." *Id.* Ultimately, the ALJ concluded "[t]hese activities are not consistent with frequent, debilitating headaches." *Id.*

    *a. Daily Activities*

The ALJ first reasoned that Dr. Zdobylak's medical opinions were not consistent with Claimant's testimony regarding her daily activities. [Dkt. 19-2 at 27.] The Court finds that the ALJ misrepresented Claimant's daily activities, failing to include Claimant's qualifying statements as to modifications, breaks, or assistance she received for all of her activities of daily living.

First, the ALJ stated that Claimant "takes care of cats for an animal shelter on a regular basis." *Id.* at 21. Claimant, however, does not work at the animal shelter; rather, she fosters kittens in her own home. *Id.* at 45. At the hearing, Claimant testified that she receives significant assistance with the kittens from her son and ex-husband. *Id.* at 67. She said, "[m]y son is—he was the reason why we got involved doing rescue because he has a—he wants to go into probably veterinary science and kind of has an obsession with baby animals. So, I could not do it without him, that's for sure. He's very good at it. He helps a lot with feedings and cleaning

8

cages." *Id.* In fact, Claimant testified that she is the most productive in the evenings due to her migraines and her son is the one who makes sure the kittens are taken care of during the day. *Id.* at 67.

Similarly, the ALJ points to the fact that Claimant home schools her son as support for discounting Dr. Zdobylak's opinion. Again, the ALJ fails to mention the significant qualifications Claimant placed on this daily activity. Claimant testified that this entails "just facilitating his lesson plans and setting up lessons and stuff." [Dkt. 19-2 at 63.] She testified that "[w]e do a lot of [the homeschooling] on the computer in home. He's on the autism spectrum, so it's kind of easier to reach him with the computer and videos. Netflix is our best friend. There is a lot of videos and stuff online." *Id.* at 64. Claimant also testified that she does not have to monitor him to ensure he completes his lessons. *Id.* Further, Claimant testified that she is able to home school her son even with her migraines because "no one dictates what time of day that we do it," so she is able to home school him mainly during the afternoons and evenings when Claimant says she is most productive. *Id.* at 66-67.

Finally, the ALJ found Claimant's trips to Florida to be inconsistent with Dr. Zdobylak's opinion. Claimant testified that she drives to Florida about every three months to see her elderly grandparents. [Dkt. 19-2 at 62-63.] Claimant testified that her grandfather has cancer, and she travels to help her grandmother because "she can't keep up with cleaning the house and yard work." *Id.* Claimant's grandmother "pays for my gas to drive down and come home, to come down, and I'll usually stay for about three weeks with her and just be there with her." *Id.* Claimant is accompanied by her son and sometime by her ex-husband. *Id.*

The ALJ's failure to acknowledge Claimant's qualifications, accommodations, and assistance that she receives in regard to her daily activities is troubling. "[A] person's ability to

9

perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue,* 705 F.3d 631, 639 (7th Cir. 2013). Nor can an ALJ equate the ability to perform basic tasks with the ability to hold a job. This is because "extrapolating from what people do at home, often out of necessity, to what they could do in a 40-hour-a-week job is perilous . . . and sheer necessity may compel one to perform tasks at home no matter how painful. . . ." *Forsythe v. Colvin*, 813 F.3d 677, 679 (7th Cir. 2016); *see also Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (holding that ALJ's "casual equating of household work to work in the labor market cannot stand," especially because ALJ attached great significance to the fact that claimant "is able to care for her personal needs and those of her two small children."); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) (explaining that "[t]he pressure, nature of the work, flexibility in the use of time, and other aspects of a working environment as well, often differ dramatically between the home" and the place of employment.); *Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004) (finding that the ALJ's failure to consider the difference between a claimant's ability to engage in sporadic physical activities and her being able to work eight hours a day for five consecutive days of the week required remand).

Therefore, the ALJ's determination that Claimant's activities are inconsistent with Dr. Zdobylak's opinion that her headaches are "debilitating" is unsupported by the record. Neither the Claimant nor Dr. Zdobylak claimed that Claimant suffers from headaches one hundred percent of the time, and Claimant explained how she is able to do the activities pointed to by the ALJ on a flexible schedule and with help. Contrary to the Commissioner's argument, this is not a case in which the ALJ's minimal articulations built a logical bridge to her ultimate conclusion.

[Dkt. 24 at 10.] The ALJ may not overstate Claimant's activities and leave out all of Claimant's qualifying statements.

### b. Subjective Symptoms

Having mistakenly found the Dr. Zdobylak's opinion is inconsistent with other evidence in the case record, the ALJ also stated that she discounted Dr. Zdobylak's medical opinion because, since he "did not see the claimant until September of 2016, it is clear that he relied on the claimant's statements (i.e., the description of her symptoms) and not on objective clinical findings." *Id.* at 21. As an initial matter, "there is no objective measure for migraine symptoms." *Overton v. Saul*, 802 F. App'x 190, 192 (7th Cir. 2020) (citing *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014) (discussing the "inability to objectively measure the pain associated with migraines.")). Moreover, the ALJ's reason, alone, is insufficient to discount a treating source opinion. *See Reinaas*, 953 F.3d at 466 (concluding an ALJ improperly discounted the treating physician's opinion by stating the opinion was based solely on the claimant's subjective complaints because the ALJ ignored medical records indicating that the claimant was consistently in pain). It is often necessary for a physician to make his own credibility determinations when treating a patient and base his opinions (as well as his diagnoses and treatment plans) in part on a patient's subjective complaints and symptoms. In fact, Dr. Zdobylak expressly made his own credibility determination when he opined that Claimant was not malingering. [Dkt. 19-2 at 27.]

### c. Improvement in Symptoms

Lastly, the ALJ's decision not to give controlling weight to Dr. Zdobylak's opinion because Claimant experienced a relief in symptoms as a result of Botox treatment is illogical. Both the ALJ and the Commissioner are correct that Claimant's headaches have significantly

11

improved with Botox treatments and oral medication. The question, however, is not whether Claimant's migraines/headaches have improved, but whether the migraines/headaches she still experiences with Botox render her disabled.

Originally, Dr. Zdobylak noted that Claimant had thirty headaches per month before her first Botox treatment and that these headaches were at an intensity level of ten. [Dkt. 19-13 at 152.] However, the Botox treatments have reduced the number of headache days to eight per month and the intensity level to five out of ten. *Id.* This opinion is consistent with Claimant's testimony that, with the Botox treatments, she has gone from having "20 migraines a month to on average six to eight migraines a month." [Dkt. 19-2 at 51.] While it is undisputed that Claimant's headaches have improved with treatment, that does not support the ALJ's apparent finding that Claimant will never need to have unscheduled breaks or time off work. Despite the improvement, Claimant has around eight migraine days a month, during which she would need to lay or sit in a dark place for multiple hours. [Dkt. 19-7 at 68-69.] As Claimant argues, "[t]his still indicates a great deal of time off task." [Dkt. 25 at 2.] Nor, contrary to the Commissioner's argument, does "[h]aving spontaneous headaches eight days a month that require bed rest. . . [get] addressed by avoiding environmental factors in the workplace or working in two-hour segments at a time." *Id.* Given this, Dr. Zdobylak's opinion that Claimant would likely be absent from work multiple days a month and would require unscheduled breaks is, in fact, consistent with the record.

Additionally, it is unclear what medical opinion the ALJ relied on in making her decision; an ALJ is not permitted to "play doctor." *Browning v. Colvin*, 755 F.3d 702, 705 (7th Cir. 2014). Because "there is always a danger when lawyers and judges attempt to interpret medical reports," ALJs must rely on medical evidence and opinions for their decisions. *Israel v.*

*Colvin*, 840 F.3d 432, 439 (7th Cir. 2016). In this case, the ALJ failed to confront the fact that Claimant still has eight headache days per month. It is unclear what, if any, support she had to determine that the Claimant would no longer require unscheduled breaks or time off work. She gave "limited weight" to the opinion of the treating physician and only "some evidentiary weight" to the opinions of the State consultants. [Dkt. 19-2 at 27.] She did not point to any other medical evidence or opinions she gave significant weight to in determining Claimant's physical limitations. Therefore, there is no evidence to indicate that the ALJ's assessment was based on anything other than her own unqualified medical opinion, which is not a sufficient basis. Relying on her own judgment rather than the opinions of any of the physicians is the ALJ impermissibly "playing doctor," which is a reversible error.

      The reasons articulated by the ALJ for rejecting the opinion of Claimant's treating physician are not supported by substantial evidence. Remand is required to correct this error.[4] The Court "want[s] to emphasize here that [it is] not suggesting that the ALJ was required to reach a certain conclusion regarding the nature of . . . the severity of [Claimant's] migraines. The error here is the failure to address all of the evidence and explain the reasoning behind the decision to credit some evidence over the contrary evidence, such that [the Court] could understand the ALJ's logical bridge between the evidence and the conclusion." *Moore,* 743 F.3d at 1124.

---

[4] Claimant also argues that in discounting Dr. Zdobylak's opinion, the ALJ's RFC and related hypotheticals to the VE failed to account for her need for time off task to recover from her migraines. [Dkt. 22 at 17.] The ALJ must orient the VE to all of Claimant's limitations on remand.

### B. Moderate Limitations in Concentration

Claimant also argues the "ALJ committed reversible error by failing to provide any logical explanation for her dismissal of the state agency psychologists' potentially disabling opinion of moderate 'checkbox' limitations to elements of concentration and adaptation plus marked 'check-box' limitations to social interaction, as well as their additional narrative explanations of those moderate and marked limitations." [Dkt. 22 at 18.]  Contrary to Plaintiff's argument, however, the ALJ did not dismiss the state agency's psychologist's opinion.

State agency psychologist, Dr. Ken Lovko,

> found moderate limitations to working in coordination with or in proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods, and responding appropriately to changes in the work setting, as well as a marked limitation to interacting appropriately with the general public.

*Id.* at 19 (citing [Dkt. 19-3 at p. 21-22]).  In the narrative portion of his opinion, Dr. Lovko found that

> [w]hile it is expected that claimant would be unable to complete complex tasks, claimant is able to complete repetitive tasks on a sustained basis without special consideration.  It appears that claimant would be able to manage occasional contact with the public but sustained, intensive, interpersonal contact would be precluded.  The claimant would appear to work best alone, in semi-isolation from others or as part of a small group.  Totality of the MER suggests that claimant seems to be able to maintain at least a minimal level of relationship with others.

[Dkt. 19-3 at 23.]  The ALJ "accord[ed] some evidentiary weight to this assessment.  However, [she found] that the claimant is limited to carrying out short, simple, routine tasks. . . ." [Dkt. 19-2 at 21.]  Specifically, the ALJ stated that Claimant could

> sustain attention and/or concentration for at least two-hour periods at a time and for eight hours in the workday for carrying out short, simple, routine tasks.  She is able to use judgment in making work-related decisions consistent with this type

14

> of work (i.e. short, simple, and routine work). She is unable to perform tasks that require fast-paced production work or assembly line work.

[Dkt. 19-2 at 23-24.][5] Moreover, the ALJ stated:

> I find the claimant has the mental capacity to understand, remember and follow simple instructions, but is restricted to work involving more limited interactions with the general public, coworkers and supervisors. Within these parameters, and in the context of performing simple and repetitive tasks, she is able to sustain the attention and concentration necessary to carry out work-like tasks with reasonable pace and persistence. While [I] note a 'moderate' limitation in the 'paragraph B' criteria above for concentration, persistence or pace, this is based upon the record as a whole and all situations the claimant might encounter. However, when limited as described herein, her ability to function is higher. Within these parameters, the claimant is able to sustain attention, concentration and persistence needed to perform on a regular basis.

[Dkt. 19-2 at 27.] Ultimately, the Court agrees with the Commissioner that the ALJ "did not give greater weight to Dr. Lovko's opinion because she assessed *greater limitations* than opined by Dr. Lovko." [Dkt. 24 at 18.]

Relatedly, the Court rejects Claimant's argument that the VE testified that Claimant was disabled based on Dr. Lovko's opinion. At Claimant's hearing, Claimant's attorney specifically asked the VE if a person could find a job in the national economy who "would work best alone

---

[5] If, on remand, the ALJ again determines that Claimant can concentrate for two hours at a time, she should provide a specific explanation for that finding. *See, ex. Simpson v. Astrue*, 2013 WL 1294517, at *4 (S.D. Ind. Mar. 28, 2013) ("The 'ALJ's hypothetical not only omitted reference to Plaintiff's moderate difficulties with concentration, persistence, or pace, but implied that Plaintiff indeed had the capability to concentrate for up to two hours. Thus, because the ALJ's hypothetical did not supply the vocational expert with adequate information regarding Plaintiff's limitations, the expert was unable to determine whether there were jobs that Plaintiff could perform."); *Goodman v. Saul*, 2020 WL 3619938, at *9 (N.D. Ind. Jun. 10, 2020) (citations omitted) ("[T]he Commissioner has in another recent case indicated that normal breaks occur every two hours during a regular 8-hour workday. *Braithwaite v. Commissioner of Social Security*, 2011 WL 1253395, at *5 n. 4 (E.D. Cal. March 31, 2011). . . . It does not seem to make sense to conclude, as the ALJ apparently did here, that an individual with moderate limitations in the ability to maintain attention and concentration would require the same frequency of breaks as a typical worker.").

on [sic] semi-isolation from others or as part of a small group." *Id.* at 76. After some confusion about the meaning of Claimant's attorney's words, the VE only response was "I don't think any job is truly in isolation." *Id.* The Court cannot agree with Claimant that the VE testified that a person who would **work best** alone, in semi-isolation, or in small groups would be disabled. [Dkt. 22 at 19.] Rather, the VE never actually responded to Claimant's attorney's hypothetical, and as such, it is impossible for this Court to determine what, if anything, can be gleaned from such a response. Moreover, Dr. Lovko only stated that Claimant would work best alone, in semi-isolation, **or** in small groups. He did not say that Claimant could "sustain adequate concentration when in semi-isolation or alone, but not when exposed to colleagues or supervisors." [Dkt. 22 at 21.] In fact, he stated that Claimant could "maintain at least a minimal level of relationship with others." [Dkt. 19-3 at 23.]

   Claimant also relies on cases such as *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015), to argue that the Seventh Circuit has held that an ALJ attempting to account for moderate limitations in concentration, persistence, and pace by limiting claimants to unskilled work is insufficient. However, several more recent Seventh Circuit cases addressing limitations in concentration, persistence, and pace have suggested that the type of RFC determination made in this case may be sufficient, as long as it accounts for Claimant's identified limitations. For example, the Seventh Circuit in *Recha v. Saul* held that ALJs have wide latitude in wording RFCs. *Recha v. Saul*, 843 Fed. Appx. 1 (7th Cir. 2021). In *Bruno v. Saul*, the Seventh Circuit held that while limiting claimants to simple tasks generally is not sufficient to account for moderate limitations in concentration, persistence, and pace, it was sufficient in that case because that restriction fully accounted for the claimant's limitations as found by the ALJ and the medical opinions he relied on. *Bruno v. Saul*, 817 Fed. Appx. 238 (7th Cir. 2020). This new line of cases

suggests that the ALJ's RFC determination here may have sufficiently accounted for Claimant's moderate limitations.

On remand, the ALJ should be sure to clearly articulate how her RFC assessment accounts for her own finding of moderate limitations in concentration, persistence, or pace. If the ALJ again uses the terms "short, simple, and routine work" and "fast-paced production work" in her RFC, she should specify in her hypothetical questions to the VE what she means by those terms.

## V. Conclusion

For the reasons stated above, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order.

SO ORDERED.

Dated: 6 AUG 2021

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.